# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs at Knoxville September 16, 2014

## MICHAEL J. SHIPP v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Maury County**
**No. 20158     Robert L. Jones, Judge**

_____

**No. M2014-00065-CCA-R3-PC - Filed October 29, 2014**

_____

Petitioner, Michael J. Shipp, stands convicted of first degree premeditated murder and aggravated robbery and is serving an effective life sentence in the Tennessee Department of Correction. In his post-conviction petition, petitioner claimed that he did not receive effective assistance of counsel at trial because his attorney failed to seek suppression of his statement to the police. The post-conviction court denied relief. Following our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., JJ., joined.

Jacob J. Hubbell, Columbia, Tennessee, for the appellant, Michael J. Shipp.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Senior Counsel; T. Michel Bottoms, District Attorney General; and Kyle E. Dodd, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Facts from Trial

This case stems from the April 1, 2010 shooting death of Howard Baugh in Columbia, Tennessee. *See State v. Michael Jarvis Shipp*, No. M2011-01876-CCA-R3-CD, 2012 WL 3776678, *1 (Tenn. Crim. App. Aug. 31, 2012). Petitioner was indicted for first degree premeditated murder and especially aggravated robbery. *Id.* Because petitioner was seventeen years old at the time of the offenses, the juvenile court had jurisdiction. *Id.* The juvenile court ordered a psychiatric examination pending trial and granted the State's motion

to transfer petitioner's case to the circuit court. *Id.* Petitioner filed a pre-trial notice of his intent to raise a claim of self-defense. *Id.*

At trial, the State presented evidence that petitioner shot the victim six times and drove away in the Dodge Charger that the victim had been driving that day. *Id.* at \*1-5. The medical examiner testified that the victim had six gunshot entry wounds, three exit wounds, and blunt force trauma. *Id.* at \*1. The victim's girlfriend, Carissa Stone, and her brother, Charles Stone, both testified about an argument between Ms. Stone and petitioner and petitioner's subsequent shooting of the victim, and this court summarized their testimony as follows:

> Carissa Stone testified that the victim was her boyfriend and the father of her son. She told the jury that on April 1, 2010, the victim took her in a black Dodge Charger to Tiffany Conger's house on Morningside Lane to dye Easter eggs. Several adults, including [petitioner], and three children were also present. At some point, Ms. Stone's brother gave her a telephone charger, which she placed on a table. Subsequently, the victim returned to Ms. Conger's home, and Ms. Stone left with him, leaving the charger on the table. A short time later, the victim brought Ms. Stone back to Ms. Conger's house and left. When Ms. Stone re-entered Ms. Conger's house, the telephone charger was not on the table. She noticed that [petitioner] was in possession of the same kind of charger, so she asked him if it was her charger. They "exchanged words," and Ms. Stone called the victim to tell him that [petitioner] would not return her telephone charger. Shortly thereafter, two people who had been in a different room approached Ms. Stone and returned her charger to her. Upon learning that the cellular telephone charger that had been in [petitioner]'s possession was not her charger, Ms. Stone apologized to [petitioner]. [Petitioner] told her, "I don't accept apologies." She then called the victim and told him not to come to Ms. Conger's house. The victim arrived at Ms. Conger's house despite Ms. Stone's telling him that he did not need to return. At that time, Ms. Stone began to gather her child's belongings so they could leave with the victim.

> The victim parked his car on the street in front of Ms. Conger's house. Ms. Stone went outside to speak with him. As she was explaining to the victim that his return was not necessary, he told Ms. Stone that he wanted to speak with [petitioner] and "diffuse the situation." Simultaneously, [petitioner] stepped outside and sat on the back of a car that was parked in the driveway. The two vehicles were approximately fifteen feet apart. The victim told Ms. Stone to ask [petitioner] to walk to his vehicle and talk with him.

-2-

[Petitioner] said, "No. Tell him to come here." The victim exited his vehicle and walked over to [petitioner]. Ms. Stone stated that the victim did not appear to be angry and was not carrying a weapon. Ms. Stone walked inside the house to get her son so they could leave. While inside, she did not hear the men's voices at all. They were not shouting or yelling. Ms. Stone was in the process of placing her son in his car seat when she heard three gunshots in rapid succession. She began to scream and "hit the floor." She waited for the sound of more shots but did not hear any more. She stood up, and [petitioner] walked through the door. He approached Jonathan Martin, who was inside the house, and said, "Give me the strap, cuz, so I can finish this [expletive] off." Martin handed [petitioner] a gun. [Petitioner] walked back outside. Ms. Stone then heard two more gunshots. She stayed inside and waited for [petitioner] to leave. When she saw [petitioner] drive away in the victim's black Dodge Charger, she went outside to check on the victim . . . .

Charles Stone, Carissa Stone's brother, testified that on April 1, 2010, he . . . was visiting with people at Ms. Conger's house at 154 Morningside Lane. While there, he witnessed the argument between his sister and [petitioner]. Mr. Stone testified that the argument involved a misplaced cellular telephone charger. He told the jury that it was a misunderstanding and that Ms. Stone apologized to [petitioner] when she located her charger. He heard the victim's car pull up to the house and saw Ms. Stone walk outside. Shortly thereafter, [petitioner] followed her outside. Thirty seconds to one minute later, Ms. Stone re-entered the house. At the time, Mr. Stone was seated in the living room area holding his nephew.

After several minutes passed, Mr. Stone thought that "it was too quiet" outside so he walked out of the front door to see what was happening in the front yard. He looked to the left side of the house where the driveway was located and, not seeing anything, stepped back inside. As he was walking back to the living room, he heard three gunshots. Upon hearing gunshots, Mr. Stone ran toward the back door. He circled around the rear of the house to the driveway area and saw the victim lying on the ground. Mr. Stone observed that the victim had been shot and was having a difficult time moving. He attempted to render aid to the victim. As he was doing so, he looked toward the front of the house and saw [petitioner] walking toward them holding a gun. Mr. Stone fled toward the back of the house. When Mr. Stone saw [petitioner] moving closer to the victim, he moved closer to observe the next events. He saw [petitioner] load the weapon and heard him say, "This is for my [expletive]. I know you had something to do with it." The victim protested

and tried to crawl toward the house, but [petitioner] shot him two more times. When Mr. Stone heard car doors closing, he believed that [petitioner] was leaving, so he rushed to the victim. He yelled for someone inside of the house to call 9-1-1. He attempted to apply pressure to the victim's gunshot wounds. Mr. Stone remained with the victim until police arrived. He testified he and the victim were very close friends.

*Id.* at *2-3.

The owner of the black Dodge Charger testified that the victim had borrowed her car and that the police returned it to her the day after the victim's death. *Id.* at *3. The car's front end was damaged, and electronic components had been taken. *Id.*

Police officers testified about forensic evidence and the investigation into the victim's death. *Id.* at *1, *3-5. Officers also testified about petitioner's arrest and his subsequent interview. *Id.* at *4-5. Sergeant Jeff Duncan conducted petitioner's interview and provided the following testimony at petitioner's trial, as summarized by this court on direct appeal:

[Sergeant Duncan] administered Miranda warnings to [petitioner], and [petitioner] initialed the form indicating that he understood his rights.

As Sergeant Duncan began the interview, [petitioner] immediately stated he was not present at the scene. Sergeant Duncan informed [petitioner] that several witnesses placed him at the scene. Sergeant Duncan then asked [petitioner] if he was ever in fear on the night in question, to which [petitioner] responded affirmatively. [Petitioner] then recounted the argument with Ms. Stone over the cellular telephone charger and how she had called her boyfriend, the victim, to come to the house. He told Sergeant Duncan that when the victim arrived, Ms. Stone went outside to speak with him, and [petitioner] walked outside soon thereafter and sat on a nearby vehicle. He confirmed that the victim called him over, that Ms. Stone went back inside the house, and that the victim then walked toward him. [Petitioner] told Sergeant Duncan that he and the victim "exchanged words" over the argument involving the telephone charger and that the victim became disturbed when [petitioner] called Ms. Stone "[s]ome unflattering names." [Petitioner] stated that at that point, the victim grabbed him and threw him to the ground, and that while on the ground, [petitioner] saw a pistol lying on the ground. [Petitioner]'s theory was that the gun must have fallen from the victim when the victim threw him to the ground. He explained that while he was on the ground, the victim was still approaching him, so he grabbed the pistol and fired three to four times.

-4-

[Petitioner] originally told Sergeant Duncan that after he fired the initial shots, he drove away in the victim's automobile. He later admitted that another person, Jonathan Martin, was with him when he drove away. Although Sergeant Duncan questioned [petitioner] about the second set of shots, he could not give an answer. [Petitioner] said he threw the gun into the woods adjacent to the location where officers recovered the abandoned vehicle. Officers searched but did not recover a weapon. [Petitioner] admitted stealing the radio from inside the car and selling it to an unknown black male. [Petitioner]'s written statement was admitted into evidence at trial.

*Id.* at *4-5.

Petitioner did not testify at his trial but called two police officers to testify on his behalf. *Id.* at *5. One of the officers, Officer Jonathan Stotler, testified that Charles Stone gave him a written statement after the shooting. *Id.* This court summarized Officer Stotler's testimony as follows:

Mr. Stone wrote that following the first set of shots, [petitioner] went to a vehicle and retrieved the second weapon. Mr. Stone neglected to write down the fact that he walked outside through the front door prior to the shooting and did not see or hear anything. Mr. Stone's statement did not include his hearing [petitioner] load or "rack" the gun, as he testified at trial.

*Id.*

Subsequently, the jury convicted petitioner of first degree premeditated murder and the lesser-included offense of aggravated robbery. *Id.* at *1. Petitioner received a life sentence for the murder conviction and a concurrent sentence of eight years for the aggravated robbery conviction. *Id.*

## II. Facts from Post-Conviction Hearing

Petitioner filed his original petition for post-conviction relief on June 14, 2013. The post-conviction court determined that petitioner had presented a colorable claim and

appointed counsel to represent him. Post-conviction counsel relied on petitioner's original claim at the post-conviction hearing on February 20, 2014.[1]

Petitioner was the first witness to testify at his post-conviction hearing. He testified that he was seventeen years old when he was arrested for Howard Baugh's murder. He could not recall whether detectives advised him of his constitutional rights prior to his interview. Petitioner said that he told the detectives that "he had shot [the victim] after [the victim] had [thrown petitioner] on the ground," that he did not have his own gun, and that the gun he used to shoot the victim was actually the victim's gun, which had fallen from the victim's hip when the two men struggled. Petitioner believed that the State would not have been able to prove that he was at the scene of the murder but for his statement[2] to the police because the police testified at trial that there was no physical evidence (i.e. "fingerprints on the shell casings") that petitioner had been at the scene. Regarding previous interactions with the police, petitioner testified that he had been detained on several occasions as a juvenile but that his interactions with the police had been limited to his being placed in a patrol car until his mother came to get him. He was not given *Miranda* warnings on those occasions.

Petitioner testified that he never discussed *Miranda* warnings with trial counsel in this case. He said that he believed trial counsel was ineffective for never addressing the fact that the police did not call his mother when he was detained and for not raising the issue of petitioner's mental evaluation. Petitioner testified that his mental evaluation showed that he suffered from post-traumatic stress disorder, which he believed was caused by his witnessing the deaths of two relatives by gunfire and by his mother's use of drugs when pregnant with him. Petitioner said that he used marijuana regularly from age nine until his detention in this case. He testified that he had smoked marijuana approximately one hour before his arrest. Petitioner said that he and trial counsel never discussed his drug use.

On cross-examination, petitioner agreed that he had a high tolerance for marijuana and that his use of that drug would not have led to him lying to the police. Petitioner opined that he might have told the police that he understood what they told him even if he did not truly understand because he "was ready to get up out of there." He said that he would have been able to "focus better" if his mother had been with him during the interview, which would have allowed him to be more honest with the police about whether he understood his rights. Petitioner testified that if his statement had been suppressed, he would have been acquitted

---

[1] We will limit our recitation of the post-conviction hearing testimony to the single issue presented on appeal.

[2] Petitioner gave both an oral and a written statement to the police.

because the only other evidence against him was inconsistent statements from the eyewitnesses, Carissa Stone and Charles Stone.

Wanda Lindsey, petitioner's aunt by marriage, testified that she considered herself petitioner's mother because she had raised him from when he was two days old. She explained that his biological mother used cocaine during her pregnancy and that she was unable to raise him. Ms. Lindsey stated that on the day of petitioner's arrest for the victim's murder, she had notified the police of petitioner's location. Ms. Lindsey's daughter called to tell her that petitioner had cooperated with the police and that they were transporting him to the detectives' office. Ms. Lindsey said that she went to the detectives' office. She told a police officer that she wanted to be with petitioner when the detectives questioned him, but the officer would not allow her to do so. She said that when petitioner had previously been in trouble, the police called to discuss the matter with her and released him into her custody.

Trial counsel testified that he had practiced law since August 2004. He first represented petitioner on a juvenile petition unrelated to the instant case. Trial counsel testified that petitioner had twenty-eight separate juvenile cases, the earliest being in 2001. Trial counsel noted that the types of cases escalated over time. The juvenile court asked trial counsel to represent petitioner in this case in April 2010, immediately prior to his juvenile detention hearing. At the end of the detention hearing, trial counsel requested a mental evaluation of petitioner. He recalled that the result of the mental evaluation was that petitioner did not "meet the criteria for an alternative commitment and also was capable to stand trial." Trial counsel testified that after petitioner's case was transferred to circuit court, the court reappointed him to represent petitioner. He subsequently filed a motion for discovery. Part of the discovery he received was petitioner's written statement to the police and a recording of petitioner's interview with the police.[3] Trial counsel stated that he was able to review both the written statement and the recording. According to trial counsel, the entirety of petitioner's written statement was, "[S]o y'all going to hold me for trying to protect my life." Trial counsel testified that the written statement contained a standard admonition of *Miranda* warnings that had been initialed by petitioner. Trial counsel recalled that the recording of petitioner's interview also showed a police officer administering the standard *Miranda* warnings to petitioner. Trial counsel said that nothing indicated petitioner failed to understand the warnings and stated that petitioner never asked for an attorney or for Ms. Lindsey. He described petitioner's demeanor during the interview as polite and straightforward.

---

[3] We note that this recording was not entered into evidence at trial. However, the written statement was entered into evidence, and police officers testified about petitioner's oral statement.

Trial counsel testified that he had researched the likely success of a motion to suppress petitioner's statement. He particularly recalled studying *State v. Gordon*, 642 S.W.2d 742 (Tenn. Crim. App. 1982), and *State v. Cortez Griffin*, No. W2007-00665-CCA-R3-CD, 2009 WL 4642604 (Tenn. Crim. App. 2009). Trial counsel stated that both cases were factually similar to petitioner's in that the defendants were "[y]oung men about to turn of age charged with serious crimes [who] gave statements and later on raised the issue about a parent needing to be present when that was given." Trial counsel testified that the case law indicated to him that "the voluntariness and admissibility of a juvenile's confession is not dependent upon the presence of his parents or an attorney at the interrogation when full *Miranda* warnings have been given and understood." He said that based on his review of the evidence, the police had given petitioner *Miranda* warnings, and petitioner understood those warnings. Trial counsel further testified about the six factors outlined in *Cortez Griffin*[4] and applied the factors to petitioner's circumstances. He said that he did not believe a motion to suppress would have been successful. Trial counsel testified that the statement was actually beneficial to petitioner because it was "a very good self-defense argument" that the State was putting forward without anyone to contest petitioner's version of the facts. Trial counsel claimed that his decision not to seek suppression of the statement was tactical and "was just a way to make the best of a bad situation."

---

[4] The *Cortez Griffin* court wrote:

In determining whether a juvenile defendant voluntarily and knowingly waived his rights, the court must consider the following factors:

(1) consideration of all circumstances surrounding the interrogation including the juvenile's age, experience, education, and intelligence;

(2) the juvenile's capacity to understand the *Miranda* warnings and the consequences of the waiver;

(3) the juvenile's familiarity with *Miranda* warnings or the ability to read and write in the language used to give the warnings;

(4) any intoxication;

(5) any mental disease, disorder, or retardation; and

(6) the presence of a parent, guardian, or interested adult.

*Cortez Griffin*, 2009 WL 4642604, at *7-8 (quoting *State v. Callahan*, 979 S.W.2d 577, 583 (Tenn. 1998)).

Following the hearing, the post-conviction court filed a written order denying relief. In its order, the post-conviction court listed the factors enumerated in *Cortez Griffin* and stated, "Even though the factors would have permitted a good faith attempt to suppress the statement, the need for evidence of self[-]defense, without subjecting [petitioner] to cross-examination, mandated a strategy of letting the statement into evidence." Consequently, the post-conviction court ruled that petitioner had not proven he received ineffective assistance of counsel.

## II. Analysis

Petitioner contends that trial counsel was ineffective for failing to file a motion to suppress petitioner's statement to the police.[5] Specifically, he contends that a motion to suppress his statement would have been successful based on the *Callahan* factors listed in *Cortez Griffin* and that the outcome of his trial would have been different but for his statement. The State responds that petitioner failed to establish that his motion to suppress would have been successful or that the outcome of his trial would have been different.

To obtain relief in a post-conviction proceeding, a petitioner must demonstrate that his or her "conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009)).

Appellate courts do not reassess the post-conviction court's determination of the credibility of witnesses. *Dellinger v. State*, 279 S.W.3d 282, 292 (Tenn. 2009) (citing *R.D.S. v. State*, 245 S.W.3d 356, 362 (Tenn. 2008)). Assessing the credibility of witnesses is a matter entrusted to the post-conviction judge as the trier of fact. *R.D.S.*, 245 S.W.3d at 362 (quoting *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). The post-conviction court's findings of fact are conclusive on appeal unless the preponderance of the evidence is otherwise. *Berry v. State*, 366 S.W.3d 160, 169 (Tenn. Crim. App. 2011) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App.1997)). However, conclusions of law receive no presumption of correctness on appeal. *Id.* (citing *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001)). As a mixed question of law and fact, this court's review of petitioner's ineffective assistance of counsel claims

---

[5] On appeal, petitioner refers generally to his "statement"; we have interpreted petitioner's argument to encompass both his oral and written statements.

is de novo with no presumption of correctness. *Felts v. State*, 354 S.W.3d 266, 276 (Tenn. 2011) (citations omitted).

The Sixth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, and article I, section 9 of the Tennessee Constitution require that a criminal defendant receive effective assistance of counsel. *Cauthern v. State*, 145 S.W.3d 571, 598 (Tenn. Crim. App. 2004) (citing *Baxter v. Rose*, 523 S.W.2d 930 (Tenn. 1975)). When a petitioner claims that he received ineffective assistance of counsel, he must demonstrate both that his lawyer's performance was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Finch v. State*, 226 S.W.3d 307, 315 (Tenn. 2007) (citation omitted). It follows that if this court holds that either prong is not met, we are not compelled to consider the other prong. *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004).

To prove that counsel's performance was deficient, petitioner must establish that his attorney's conduct fell below an objective standard of "'reasonableness under prevailing professional norms.'" *Finch*, 226 S.W.3d at 315 (quoting *Vaughn v. State*, 202 S.W.3d 106, 116 (Tenn. 2006)). As our supreme court held:

> "[T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence. . . . Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations."

*Id.* at 315-16 (quoting *Baxter*, 523 S.W.2d at 934-35). On appellate review of trial counsel's performance, this court "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 689).

To prove that petitioner suffered prejudice as a result of counsel's deficient performance, he "must establish a reasonable probability that but for counsel's errors the result of the proceeding would have been different." *Vaughn*, 202 S.W.3d at 116 (citing *Strickland*, 466 U.S. at 694). "A 'reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland*, 466 U.S. at 694). As such, petitioner must establish that his attorney's deficient performance was of such magnitude that

he was deprived of a fair trial and that the reliability of the outcome was called into question. *Finch*, 226 S.W.3d at 316 (citing *State v. Burns*, 6 S.W.3d 453, 463 (Tenn. 1999)).

In this case, petitioner asserts that a motion to suppress his statement would have been successful and that, therefore, his trial counsel was ineffective for failing to file a suppression motion. However, trial counsel testified that he studied the issue prior to trial and was familiar with the appropriate standard. He did not believe that such a motion would have been successful and outlined his reasoning behind his decision. Instead, trial counsel chose to use petitioner's statement to advance a theory of self-defense. Such a decision in light of the devastating evidence against petitioner was reasonable. "The fact that a particular strategy or tactical decision failed does not by itself establish deficiency." *Felts*, 354 S.W.3d at 277. Thus, we conclude that petitioner has not shown that trial counsel was deficient. Moreover, it is clear that even if petitioner's statement had been suppressed, the result of the trial would have been the same considering the testimonies of Carissa Stone and Charles Stone. Therefore, petitioner's argument that he received ineffective assistance of counsel is without merit.

## CONCLUSION

Based on the record, the briefs of the parties, and the applicable law, we affirm the judgment of the post-conviction court.

_____
ROGER A. PAGE, JUDGE

-11-